UNIVERSAL UNDERWRITERS GROUP v ALLSTATE
INSURANCE COMPANY

Docket No. 217470. Submitted February 13, 2001, at Detroit. Decided July
20, 2001, at 9:05 A.M.

Universal Underwriters Group brought an action in the Genesee Cir-
cuit Court against Allstate Insurance Company, seeking reimburse-
ment for personal injury protection (PIP) benefits that the plaintiff
paid to Cherry Broadway as a result of injuries Broadway sustained
in an automobile accident while driving an automobile she was in
the process of purchasing from Prestige Pontiac, the plaintiff's
insured. Broadway was driving the vehicle after she signed papers
indicating that her insurer, Allstate, would be the primary insurer
and after an insurance binder had been received by Prestige from
Allstate. The court, Geoffrey L. Neithercut, J., granted summary dis-
position in favor of Allstate, finding that Broadway did not have an
insurable interest in the vehicle and, therefore, had no insurance
coverage from Allstate at the time of the accident. The plaintiff
appealed.

The Court of Appeals *held*:

1. There is no requirement that an insured actually own or be the
registrant of a vehicle in order to have an insurable interest ade-
quate to support PIP coverage.

2. The binder covered Broadway and the vehicle involved in the
accident and purported to be in effect at the time of the accident.
Rights created under an insurance policy become fixed as of the
date of the accident.

3. The court improperly granted summary disposition on the
basis that Broadway lacked an insurable interest. Ownership of the
vehicle by Broadway was not necessary in order for an insurable
interest to exist under the facts of this case. The order of summary
disposition must be reversed and the matter must be remanded for
further proceedings.

Reversed and remanded.

1. INSURANCE — NO-FAULT — MOTOR VEHICLE OWNERSHIP.

An insured need not actually own or be the registrant of a motor vehicle in order to have an insurable interest adequate to support no-fault personal injury protection benefits coverage.

2. INSURANCE — NO-FAULT.

Rights created under an insurance policy become fixed as of the date of an accident.

3. INSURANCE — BINDERS.

An insurance binder is a contract of temporary insurance pending issuance of a formal policy or proper rejection by the insurer.

*Thomas J. Doyle,* for the plaintiff.

*Collison, Collison & Zimostrad, P.C.* (by *Jeffrey C. Collison* and *Michael J. Hutchinson*), and *Ruwart & Karas* (by *Timothy P. Ruwart*), for the defendant.

Before: WHITE, P.J., and WILDER and ZAHRA, JJ.

PER CURIAM. Plaintiff Universal Underwriters Group appeals as of right from an order denying its motion for summary disposition and granting summary disposition in favor of defendant Allstate Insurance Company in this insurance coverage dispute. We reverse and remand.

I

A

This case arises from an April 28, 1996, motor vehicle accident Cherry Broadway was involved in while driving a 1989 Buick LeSabre she was in the process of purchasing from Prestige Pontiac. As a result of injuries Broadway sustained, plaintiff, as Prestige's insurer, paid personal injury protection (PIP) benefits to Broadway. Plaintiff filed the present action against defendant seeking reimbursement for the benefits

paid. Plaintiff alleged that defendant provided insurance to Broadway and was responsible for the benefits paid by plaintiff. Defendant claimed that defendant's insurance binder had not taken effect and that Broadway did not have an insurable interest in the vehicle at the time of the accident. The circuit court granted summary disposition in defendant's favor, concluding that Broadway did not have an insurable interest in the vehicle and therefore had no insurance coverage at the time of the accident.

B

On Wednesday, April 24, 1996, Broadway went automobile shopping at Prestige with Kevin Edmonds,[1] an agent of defendant Allstate Insurance. On that day, Broadway applied for financing for the LeSabre, informed the Prestige salesman that she did not own a vehicle or have insurance at that time, signed[2] a temporary driving permit allowing her to use the LeSabre while financing was being approved, and gave Prestige $100. Prestige's "Temporary Driving Permit" standardized form, as completed, stated that Allstate was Broadway's insurance company and that Edmonds was Allstate's agent. The temporary driving permit form contained an "Agreement" section[3] under which Broadway agreed that her insurer would be the

---

[1] Broadway testified during a deposition that she and Edmonds had been personal friends for years. Edmonds was Broadway's supervisor when Broadway worked at an Allstate agent's sales office for five months in 1994 as an office manager and receptionist.

[2] Broadway testified that she signed the document, although no signed copy was produced below.

[3] The copies of this form in the lower court record are cut off at the bottom and are partly illegible. The "Agreement" portion, with the illegible parts indicated, states:

primary insurer. A Prestige employee told Broadway that Prestige would have her financing approved and the paperwork ready for the LeSabre on Saturday, April 27, 1996, and that she should return that day and pay an additional $700. Broadway complained that something was wrong with the brakes on the LeSabre, but nevertheless took possession of the LeSabre on Wednesday April 24, 1996.

Edmonds faxed to Prestige a certificate of no-fault insurance for Broadway, covering the LeSabre, on either Friday, April 26, or Saturday, April 27, 1996.[4] The certificate stated an expiration date of September 27, 1996.[5]

When Broadway returned to Prestige as instructed on Saturday, April 27, 1996, she paid the additional $700 and stated that she was not going to purchase the LeSabre unless the brakes were repaired. Broadway testified during a deposition that she was told the financing "still hadn't been done and nor had the

---

I, the above vehicle operator agree to return the above vehicle at __ AM.

Please . . . NO Smoking, eating or drinking in vehicles on test drives—WE THANK [] Operation of this vehicle shall be restricted to the above named Operator. Without limitation of any other provision of this Agreement, Operator shall be solely liable and shall indem [] Owner harmless from all fines, penalties and forfeitures imposed for parking, traffic or other vehicle code vio [] any Federal, State, Municipal or other statute, law, ordinance, rule or regulation, while the vehicle is held [] or driven pursuant to this Agreement. In the event of an accident, I, the above [] and understand that my Auto Insurance Company would be the Primary Insure [] deductibles would apply. Prestige is not responsible for personal belon [].

[4] It is undisputed that the dealership received the certificate of insurance before the date of the accident, April 28, 1996. Broadway testified that Edmonds had told her he was going to be out of town that weekend and that he would fax a certificate of no-fault insurance to the dealership.

[5] The certificate also stated, "Notice—This is not a guarantee that the policy will remain in effect until the stated expiration date."

paperwork been typed up, but everything, they thought everything was going to work out [and told her to] [g]o ahead and keep the car," and that the paperwork should be ready on Monday, April 29, 1996, and to return then. Broadway testified that because Prestige kept telling her there was nothing wrong with the brakes, she took the LeSabre to Tuffy Muffler and to Northwest Tire and Service on the afternoon of Saturday, April 27, 1996, and obtained estimates for the needed repair work. Copies of the estimates were submitted to the circuit court.

On Sunday, April 28, 1996, Broadway was involved in an automobile accident while driving the LeSabre, resulting in minor damage to the muffler and personal injury to Broadway. On Monday, April 29, 1996, Broadway again returned to Prestige, on her way to the hospital. She was told that Prestige would repair the LeSabre's brakes and tires, clean the vehicle and do some minor repairs, and that the LeSabre would be ready that afternoon. Prestige gave Broadway a loaner vehicle. When Broadway returned later on Monday, April 29, 1996, the paperwork still was not done, nor was the LeSabre repaired.

On May 2, 1996, the dealership notified Broadway that the paperwork and the LeSabre were ready. Broadway and her daughter went to Prestige that day to finalize the purchase of the LeSabre. However, Broadway determined that the muffler had not been properly repaired and the brakes still were not operating properly. While reading through various forms, Broadway noticed a disclaimer clause that released the dealership from liability arising out of any injuries sustained while driving one of their automobiles. Broadway decided not to go through with the pur-

chase of the LeSabre because of the disclaimer clause and the inadequate repairs. Broadway testified during a deposition that she said she wanted her money back, but Prestige found her another vehicle to purchase, a 1984 Chevrolet Cavalier. Documentary evidence submitted to the circuit court[6] establishes that Guardian National Acceptance Corporation approved Broadway's financing at noon on May 2, 1996. On May 3, 1996, Broadway signed an application for a Michigan Certificate of Title and Registration for the Cavalier. The application stated that defendant was the insurer and stated the same policy number as did the certificate of insurance Edmonds had faxed to Prestige pertaining to the LeSabre. On May 6, 1996, Broadway signed a vehicle purchase agreement for the Cavalier. The $800 she had made as a down payment on the LeSabre was applied to the Cavalier. She picked up the Cavalier the following Saturday.

C

Plaintiff paid Broadway's PIP benefits and sought reimbursement from defendant. Plaintiff filed this action for declaratory judgment asserting that defendant was obligated to pay Broadway PIP benefits under MCL 500.3114(1) and that if the court deemed

---

[6] The documentary evidence the parties submitted to the circuit court in support of their summary disposition motions included the insurance policy issued by plaintiff to Prestige Pontiac, Broadway's deposition, Broadway's "temporary driving permit" from Prestige Pontiac for the LeSabre (see n 2, *supra*), the certificate of insurance Edmonds faxed to the dealership, Broadway's financing application for the LeSabre, the estimates Broadway secured from Tuffy Muffler and Northwest Tire and Service of needed repairs to the LeSabre, Broadway's vehicle purchase agreement for the Cavalier, Guardian National Acceptance Corporation's financing approval statement, and Broadway's application for a Michigan title for the Cavalier.

both insurers in the same order of priority, plaintiff should be entitled to partial recoupment under MCL 500.3114(6). Plaintiff moved for summary disposition pursuant to MCR 2.116(C)(9), for failure to state a valid defense, relying on the insurance binder defendant issued April 26, 1996. Defendant answered plaintiff's motion for summary disposition and moved for summary disposition pursuant to MCR 2.116(C)(10), asserting that the insurance binder was conditioned on Broadway's actual purchase of the vehicle and that the insurance binder was not in effect on the day of the accident because Broadway did not have an insurable interest in the vehicle. The circuit court determined that Broadway had applied for financing, but did not have ownership of the vehicle when the accident occurred. The circuit court reasoned that automobile insurance could not be acquired unless one owned an automobile and, therefore, an insurable interest did not exist until one obtained ownership of a vehicle. Relying on *Clevenger v Allstate Ins Co*, 443 Mich 646; 505 NW2d 553 (1993), which states that a valid automobile liability insurance policy had to be supported by an insurable interest, the circuit court granted defendant's motion for summary disposition and denied plaintiff's motion for summary disposition.

II

Plaintiff's principal argument is that the circuit court erred in concluding that because Broadway did not own a vehicle at the time of the accident, she had no insurable interest and therefore the purported coverage was not in effect. Plaintiff argues that Broadway had an insurable interest in her own health and well-being, that defendant had issued a valid insur-

ance binder that was in effect at the time of the accident, and that defendant was the primary insurer of the vehicle at the time of the accident under the temporary driving permit Broadway had signed on April 24, 1996.

Defendant argued below that its binder was issued in anticipation of Broadway's purchase of the LeSabre, which purchase never occurred, that financing for the LeSabre had not been approved at the time of the accident, and that PIP benefits cannot be purchased independently of being either an owner or a registrant of a vehicle. Defendant notes that Prestige, as the owner and registrant of the vehicle, was required to, and did, maintain the required no-fault coverage on the LeSabre.

A

A motion for summary disposition under MCR 2.116(C)(10) tests whether there is factual support for a claim. *Libralter Plastics, Inc v Chubb Group of Ins Cos*, 199 Mich App 482, 485; 502 NW2d 742 (1993). Affidavits, pleadings, depositions, admissions, and documentary evidence are considered in reviewing a motion for summary disposition pursuant to MCR 2.116(C)(10), and the evidence is viewed "in the light most favorable to the party opposing the motion." *Quinto v Cross & Peters Co*, 451 Mich 358, 362; 547 NW2d 314 (1996). Summary disposition is proper under MCR 2.116(C)(10) if the documentary evidence shows that there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. *Id.*

B

An insurance binder is "a contract of temporary insurance pending issuance of a formal policy or proper rejection by [the insurer]." *Blekkenk v Allstate Ins Co*, 152 Mich App 65, 68; 393 NW2d 883 (1986).

> Temporary insurance is usually evidenced by a binding slip or interim receipt, usually called a "binder." A binder has generally been defined as a written instrument which is used when a policy cannot be immediately issued, *to evidence that the insurance coverage attaches at a specified time and continues until the policy is issued or the risk is declined and notice thereof given.* [43 Am Jur 2d, Insurance, § 219, p 304 (emphasis added).]

Both parties refer to the certificate of insurance Edmonds faxed to the dealership as a binder. "Binders are issued in automobile insurance situations to allow the applicant to use the car while awaiting a decision from the insurance company whether it will insure the driver." *Jackson v Transamerica Ins Corp of America*, 207 Mich App 460, 462; 526 NW2d 31 (1994), citing 7 Am Jur 2d, Automobile Insurance, § 3, pp 295-296. "In Michigan, the binder provides the proof of insurance needed for someone to register and operate a motor vehicle." *Jackson, supra* at 463, citing MCL 500.3101(1), and *Shavers v Attorney General*, 402 Mich 554, 599; 267 NW2d 72 (1978). "A binder for temporary insurance is a contract which by its nature incorporates the terms of the prospective contract whether those terms are prescribed by law or are part of the customary policy issued by the pertinent insurance company." 4 Holmes' Appleman on Insurance 2d, Binders & Temporary Insurance Generally, § 18.6, pp 82-83, citing cases including *State*

*Automobile Mut Ins Co v Babcock*, 54 Mich App 194; 220 NW2d 717 (1974). "[W]here an effective binder exists, ordinarily notice of rejection or of cancellation is required in order to relieve the insurer." Holmes, *supra*, § 18.3, p 67, citing cases including *Du Brul v American Manufacturers Mut Ins Co*, 60 Mich App 299; 230 NW2d 404 (1975), *Babcock*, *supra*, and MCL 500.3020; see also 43 Am Jur 2d, Insurance, § 222, p 310:

> As to the legal effect of a binder certificate or interim receipt, the generally accepted view is that such a slip or receipt issued by a duly authorized agent of an insurance company constitutes a temporary contract of insurance under which the company is liable for any loss occurring during the period covered by it.

In the instant case, there was a binder issued that purported to afford coverage at the time of the accident.

C

Defendant relied below on *Clevenger*, *supra*, and *Allstate Ins Co v State Farm Mut Automobile Ins Co*, 230 Mich App 434; 584 NW2d 355 (1998), but does not cite or rely on these cases on appeal. The circuit court relied on *Clevenger*.

In *Clevenger*, Douglas Preece purchased a vehicle from his aunt, JoAnn Williams, on a Saturday. Williams signed the certificate of title, transferring ownership to Preece, and allowed Preece to take the vehicle with her registration plate, registration, and proof of insurance. Preece intended to register the vehicle and obtain a registration plate and insurance on the following Monday. While driving home from Williams'

residence, Preece was involved in a head-on collision with Clifford Clevenger, who suffered injuries. Clevenger sought a declaratory judgment that Allstate had a duty to indemnify Williams and Preece under Williams' insurance policy. The circuit court entered a judgment in Clevenger's favor and the Court of Appeals reversed. The Supreme Court reversed the judgment of the Court of Appeals, concluding that Williams' insurance policy remained in effect at the time of the accident. Regarding Williams' having an insurable interest in the vehicle at the time of the accident, the Court stated:

> As registrant of the automobile, Williams, intentionally or not, complied with the no-fault statute and insured the vehicle as the registrant of the vehicle during the brief period she permitted the uninsured purchaser to operate it on a public highway. [*Clevenger, supra* at 662.]

In *Allstate, supra*, Charles Hinton, Jr., sold a vehicle to Bruce Walsh that Hinton had insured through State Farm Insurance. Walsh paid for the vehicle, Hinton signed the certificate of title over to Walsh, and Hinton removed the license plate, registration, and certificate of insurance from the vehicle. Walsh attached a license plate, but did not obtain his own insurance for the vehicle. While driving the vehicle, Walsh rear-ended a vehicle driven by James Smith, and in which Laura Smith was a passenger. The Smiths were insured by Allstate. The Smiths sought uninsured motorist benefits from Allstate but Allstate denied coverage, asserting that Walsh was covered under Hinton's policy with State Farm. A declaratory judgment action was filed to determine which insurer was liable for the Smiths' damages.

The *Allstate* Court concluded that, under *Clevenger*, Hinton did not have an insurable interest sufficient to support a valid automobile liability insurance policy at the time of the accident, because he had removed his license plate, registration, and certificate of insurance from the vehicle before giving Walsh possession, and there had been a bona fide sale of the vehicle to the extent that Hinton's status as the owner and registrant of the vehicle was destroyed. Regarding application of *Clevenger*, *supra*, the *Allstate* Court stated that it appeared that the Supreme Court in *Clevenger* had held that an insurable interest is necessary to support a valid automobile liability insurance policy, and that it also appeared that the *Clevenger* Court held that the insurable interest must belong to a named insured. The *Allstate* Court stated:

> We base our interpretation of *Clevenger* on the fact that (1) the Supreme Court addressed the defendant's "insurable interest" argument on the merits, rather than simply stating that there is no such requirement for automobile liability insurance, and (2) the Supreme Court only addressed the question whether the named insured, Williams, had an insurable interest, when it was clear that Preece had an insurable interest.
>
> We note that the Supreme Court's holdings do not represent forgone conclusions. There is a legitimate question whether liability insurance requires an "insurable interest." See *Hall v Weston*, 323 SW2d 673, 678-680 (Mo, 1959). Indeed, the "insurable interest" doctrine seems to find its origin in public policy concerns. Among those concerns is a desire to prohibit the use of insurance as a form of wagering, and a desire to prevent the creation of socially undesirable interests, such as where a creditor buys insurance on the life of a debtor for an amount greatly exceeding the amount of the debt, such that the creditor "might be [tempted] to bring the debtor's life to an unnatural end." *Lakin v Postal Life & Casualty Ins Co*, 316 SW2d 542, 551

(Mo, 1958). These public policy concerns are not implicated in the case of liability insurance, since the holder of the insurance cannot collect cash on the policy. We also note that the no-fault automobile liability insurance required in Michigan is not simply for the benefit of the policyholder or other insured. Rather, it is intended " 'to protect the members of the public at large from the ravages of automobile accidents.' " *Clevenger*, *supra* at 651, quoting *Coburn v Fox*, 425 Mich 300, 309; 389 NW2d 924 (1986). Thus, in the case of automobile liability insurance, the insurable interest appears to lie, at least to some degree, with an injured party rather than an insured.

While we have failed to discover any underlying rationale for application of the insurable interest requirement to liability insurance, we recognize that many jurisdictions observe such a requirement. See 1 ALR3d 1193, § 2, pp 1195-1196, and cases cited therein. In this case, the parties both appear to assume the applicability of the insurable interest requirement. Because *Clevenger* supports such a requirement, we conclude that, under Michigan law, an insured must have an "insurable interest" to support the existence of a valid automobile liability insurance policy. [*Allstate*, *supra* at 438-439.]

Notwithstanding *Clevenger* and *Allstate*, there is no requirement that an insured actually own or be the registrant of a vehicle in order to have an insurable interest adequate to support PIP coverage. *Madar v League General Ins Co*, 152 Mich App 734; 394 NW2d 90 (1986); *Cason v Auto Owners Ins Co*, 181 Mich App 600; 450 NW2d 6 (1989).

The plaintiff's decedent in *Madar* had a no-fault insurance policy from Auto Club Insurance Association that purported to be in effect when he was struck, while a pedestrian, by an automobile driven by a person insured by the defendant insurer. *Madar*, *supra* at 736. Before the accident, the decedent had transferred and sold the automobile named in his

Auto Club no-fault insurance policy. The plaintiff sued the defendant for PIP benefits, claiming that all the provisions of the decedent's insurance policy terminated as a matter of law when the vehicle was sold. *Id.* at 735-737. The defendant argued that it was not liable for the PIP benefits because the decedent's insurance policy had not been canceled before the accident. *Id.* at 737. In concluding that transfer of ownership of a vehicle did not automatically terminate the PIP benefits under a no-fault insurance policy, the *Madar* Court reasoned:

> An insurable interest in property is broadly defined as being present when the person has an interest in property, as to the existence of which the person will gain benefits, or as to the destruction of which the person will suffer loss. *Crossman v American Ins Co*, 198 Mich 304, 309; 164 NW 428 (1917). Plaintiff would apply this principle in the automobile context by relying upon *Payne v Dearborn Nat'l Casualty Co*, 328 Mich 173, 177; 43 NW2d 316 (1950), for the proposition that automobile insurance is entirely dependent on ownership by the named insured of the automobile described in the policy, and that there is no insurance separate and distinct from ownership of the automobile. Consequently, plaintiff argues that since plaintiff's decedent did not have an automobile on the date of the accident, he could not have no-fault automobile insurance as a matter of law because he had no insurable interest in an automobile.
>
> Plaintiff's argument fails to fully consider the substantial changes wrought in the automobile insurance area by the no-fault act. In *Lee v DAIIE*, 412 Mich 505; 315 NW2d 413 (1981) [sic, 1982], the plaintiff was injured while unloading mail from a government-owned mail truck, an insured vehicle. The Court held that the plaintiff's personal insurer was liable for the payment of personal protection benefits under the no-fault act, despite the fact that this insurer had written no coverage for the vehicle involved. 412 Mich 516. The Court expressed the underlying basis for its decision as follows:

"Our decision in this case rests, in the last analysis, upon our recognition that it is the policy of the no-fault act that persons, not motor vehicles, are insured against loss." [412 Mich 509.]

The *Lee* Court made it clear, explicitly overruling *Shoemaker v Nat'l Ben Franklin Ins Co*, 78 Mich App 175; 259 NW2d 414 (1977), that it is not required, as *Shoemaker* previously held, that a vehicle intended to be covered under the no-fault act be involved in an accident for the insurer to be liable to its insured for personal protection benefits. 412 Mich 511. The Court found that, in enacting the no-fault act, the Legislature:

"intended to provide benefits whenever, as a general proposition, an insured is injured in a motor vehicle accident, whether or not a registered or covered motor vehicle is involved; and in its narrower purpose, intended that an injured person's personal insurer stand primarily liable for such benefits whether or not its policy covers the motor vehicle involved and even if the involved vehicle is covered by a policy issued by another no-fault insurer." [412 Mich 515.]

Thus, there is no requirement that there be an insurable interest in a specific automobile since an insurer is liable for personal protection benefits to its insured regardless of whether or not the vehicle named in the policy is involved in the accident. *A person obviously has an insurable interest in his own health and well-being. This is the insurable interest which entitles persons to personal protection benefits regardless of whether a covered vehicle is involved.* [*Madar, supra* at 738-739.]

The plaintiff in *Cason, supra,* was injured when she was struck by a vehicle the ownership of which had been transferred from one party to another. The defendant insurer claimed that it was not liable for PIP benefits to the plaintiff because its insured had transferred title and ownership of the vehicle before the accident, although the vehicle was still registered in the insured's name at the time of the accident. *Cason,*

*supra* at 608. The *Cason* Court concluded that because the insured was still the registrant, the defendant insurer was liable for the PIP benefits under the no-fault act. The Court rejected the argument that MCL 257.240[7] relieved the insured and therefore the insurer from liability:

> While liability insurance coverage and motor vehicle damage insurance coverage are based upon ownership or maintenance or use of the covered automobile, PIP benefits are not conditioned on the ownership of an insured automobile. [Citing *Madar, supra* at 740-741.] In *Madar,* the insured sold his vehicle prior to the accident, but did not cancel the policy. The *Madar* Court found that where a party does not cancel his no-fault insurance policy when he transfers ownership of the insured vehicle prior to an accident, PIP coverage is still in effect. The prior transfer of ownership in the motor vehicle named in the insurance policy does not terminate the personal protection insurance coverage of the policy. *Id.,* p 736. Rights created under an insurance policy become fixed as of the date of the accident. *Id.,* p 742. Thus, since Leon did not cancel his no-fault policy when he transferred ownership of the vehicle prior to the accident and the policy was still in effect at the time of the accident, the personal protection insurance coverage was still in effect. *Id.,* pp 742-743. [*Cason, supra* at 608-609.]

*Clevenger* and *Allstate* were liability coverage cases, not PIP benefits cases, and did not overrule *Madar* and *Cason.* In fact, *Madar* and *Cason* are cited in *Clevenger, supra* at 656. Nor are we persuaded by

---

[7] The provision stated at the time:

The owner of a motor vehicle who has made a bona fide sale by transfer of his title or interest and who has delivered possession of such vehicle and the certificate of title thereto properly endorsed to the purchaser or transferee shall not be liable for any damages thereafter resulting from negligent operation of such vehicle by another.

defendant's argument that because Broadway was not *required* by law to insure the vehicle because she was not an owner or registrant of the vehicle, and Prestige was so obliged and did insure the vehicle, Broadway was *legally incapable* of obtaining the PIP coverage the binder issued by defendant purported to provide. *Madar* allowed coverage where the named insured was neither the owner nor the registrant of the vehicle at the time of the accident.

*Clevenger* and *Allstate* involved situations where there was an effort to afford liability coverage to the uninsured owner of a vehicle involved in an accident through a policy issued to the person who no longer owned the vehicle. The decisions in those cases were fact-specific. In neither case was a named insured denied meaningful coverage under the policy. In *Clevenger*, the Court concluded that because the named insured was still the registrant, there was coverage under the policy. In *Allstate*, the named insured faced no exposure because he was no longer the owner or registrant of the vehicle. Here, while Broadway, the named insured, did not yet own the vehicle, she took possession of it with the expectation of completing a sales transaction and pursuant to an agreement that her insurance would be primary. We fail to see why an otherwise valid insurance binder should be declared invalid merely because the accident preceded the completion of the sale, or because the eventual sale involved a different vehicle. The binder covered Broadway and the vehicle involved in the accident and purported to be in effect at the time of the accident. Rights created under an insurance policy become fixed as of the date of the accident. *Cason, supra* at 609.

We conclude that the circuit court improperly granted defendant summary disposition on the basis that Broadway lacked an insurable interest. Broadway signed the dealership's temporary driving permit on April 24, 1996, in which her insurance agent and insurer were identified[8] and she agreed that her insurer would be primary.[9] Defendant's agent, Edmonds, faxed a binder for the LeSabre to the dealership before Broadway was involved in the accident on April 28, 1996. No evidence was presented below that Edmonds did not have the power to bind defendant. Defendant did not cancel the policy before Broadway was involved in the accident. Under *Madar* and *Cason, supra*, ownership of a vehicle is not necessary in order for an insurable interest to exist, and defendant has cited no authority, nor have we found any, to support imposition of an ownership requirement under the circumstances presented here. *Clevenger* and *Allstate, supra*, do not foreclose our conclusion.

It appears, however, that there is a factual issue that remains unresolved. Defendant asserts that the binder was issued conditional on Broadway obtaining financing and purchasing the vehicle. While Broadway's testimony can be read as lending some support for such a claim, such an inference is not compelled, and the binder contains no such restrictions. The par-

---

[8] We recognize that there is some question whether this information was on the form when Broadway signed it.

[9] We do not mean to imply that Broadway's agreement alone determines which insurer is primary, if either. If both insurance coverages apply, the circuit court must also rely on the terms of the policies and the provisions of the no-fault act. The insurance policy pertaining to the binder for the LeSabre was not submitted below, thus its terms are not before us.

ties can address this issue on remand,[10] as well as the issue of priority between the insurers.

Reversed and remanded for proceedings consistent with this opinion. We do not retain jurisdiction.

---

[10] The record does not contain affidavits or deposition testimony from agents of Prestige or from Edmonds regarding this issue, and we are unable to say on this record that there is no genuine issue of material fact.